IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

MICHAEL YEARY and SHARON YEARY, )
                                )
            Plaintiffs,          )
                                )
v.                               )    Case No. 11-CV-472-GKF -PJC
                                )
CITY OF GROVE, an Oklahoma       )
municipality, and JASON NELSON,  )
an individual c/b/a NELSON       )
EXCAVATING, an unincorporated    )
business,                        )
                                )
            Defendants.          )

**OPINION AND ORDER**

Before the court are the Motion for Summary Judgment [Dkt. #51] of defendant City of Grove ("City") and the Motion for Summary Judgment [Dkt. #54] of defendant Jason Nelson ("Nelson").

This lawsuit arises from the installation of a water line on property the plaintiffs, Michael Yeary and Sharon Yeary ("Yearys"), own in Grove, Oklahoma. The Yearys, Joplin, Missouri, residents, allege the City and Nelson, an independent contractor, negligently located and installed a water line and meter in the lateral line field of their septic system, damaging the lateral lines. They seek damages in excess of $75,000.00 for replacement and repairs, as well as for lost profits from a business they anticipated opening on the property. Both defendants deny any negligence, and Nelson counterclaims for amounts owed for the installation. Defendants have filed motions for summary judgment.

## I. Material Facts

For 21 years, the Yearys have owned Tricks 4 Trucks, a retail establishment in Joplin that sells truck accessories and trailers. [Dkt. #54, Ex. 5, S. Yeary Dep., 15:1-16:9]. The Yearys own three lots in Grove, Oklahoma, on Grand Lake. Two of the lots are commercial. [*Id.,* 18:3-10]. The Yearys intend to move part of the trailer business of Tricks 4 Trucks to the Grove property. [*Id.,* 18:11-19:1].

In late 2009, the Yearys contracted with Nelson, an independent contractor, for the construction and installation of electrical, gas and water lines on the property in Grove. [Dkt. #54, Ex. 2, Michael Yeary Dep., 16:9-18]. The property had an existing septic tank system. Prior to installation of the lines, the City marked gas and water lines. [Dkt. #59, Ex. 3, J. Reiling Dep., 31:2-25; 49:1-22; Ex. 4. S. Yeary Dep., 11:3-12:5; 12:13-18; 32:14-33:25; 36:7-25]. During installation of the water line, Nelson started digging up green pipe and rock, and realized he was in the septic tank lateral line field [*Id.,* 76:11-14]. Nelson testified it looked like he was at the edge of the lateral line field, because the pipes had caps on them, and he had broken off approximately two feet of one or more lateral lines. [*Id.,* 77:24-2, 78:14-20; Dkt. #59, Ex. 1, Grove Municipal Services Authority Meter Installation Procedure with attached sketch of property]. He sawed off the broken end of the lateral lines and capped them. [*Id.* 78:3-8].

Nelson was aware that under Oklahoma Department of Environmental Quality ("DEQ") regulations, the water line was required to be at least 15 feet from the septic system lateral lines. [Dkt. #54, Ex. 4, Nelson, Dep., 76:1-10]. However, he could not put the line 15 feet from the end of the lateral lines because "there wasn't 15 feet left in the property." [*Id.* at 79:8-12]. Instead, he put the water line approximately five feet away from the end of the lateral

lines. [*Id.* at 79:13-23]. He knew the location of the line was not in compliance with the 15-foot requirement set by the DEQ. [Dkt. #59, Ex. 6, Nelson Dep., 80:24-81:1].

On December 2, 2009, the City installed a water meter at a location designated by Nelson. [Dkt. #51, Ex. 3, Aston York Dep., 19:19-20:8]. Other than the City policy requiring the water meter to be within five feet of the property line, the City had no input into the location of the water meter. [*Id.*]. The location was within 5 feet inside of the property line, as required by the City. [*Id.,* 20:2-4]. York testified he did not know at the time that Nelson had dug the line across a portion of the lateral field, or that the meter had been placed in the lateral field. [*Id.,* 22:22-23:4]. However, he noticed Nelson's helper pulling bits and pieces of broken pipe from the ditch where the meter was to be installed. [Dkt. #59, Ex. 5, York Dep., 18:2-16]. He did not question Nelson about the shattered pipe because he "figured that it was probably part of the fill." [*Id.,* 18:17-22].

On or about December 3, 2009, Nelson, Yeary and York met at the property and discussed "a modification "to get our 15-feet separation" between the water line and the lateral field. [Dkt. #54, Ex. 4, Nelson Dep., 77:7-14]. Nelson testified that, because the water line was already installed, the "modification" would require either shortening the lateral fields at least 10 feet or drilling a water well. [Dkt. #59, Ex. 6, Nelson Dep., 80:9-21].

Ultimately, the Yearys hired another contractor to install a water line from their building to 623 Road and the City installed a two-inch line from the water main on 620 Road along the easement of the Yeary property on 623 Road, as well as a meter, to connect the Yearys' water line to the extension on 623 Road. [Dkt. #60, Ex. 12, Application for Municipal or Rural Waterline Extension, attached drawing].

The contractor the Yearys hired to build a new water line did not dig up the lateral lines,

3

had no opinion whether and to what extent the lateral lines had been damaged by the earlier installation, and advised the Yearys to wait and see if they had any trouble before taking further action. [Dkt. #60, Ex. 4, Sharon Yeary Dep., 40:1-14]. The Yearys have never had the lateral field dug up to determine what damage, if any, Nelson caused, nor have they had the septic system tested. [*Id.* 40:15-18; 41:11-14]. They have not obtained an estimate of the cost of any repair for the allegedly damaged lateral line(s). [Dkt. #51, Ex. 1, M. Yeary Dep., 8:23-9:7]. They have not noticed a problem with the septic system since Nelson performed the work, but according to Sharon Yeary, the system "doesn't get used much." [*Id.* at 41:6-10].

Nelson testified that replacement and repair of the damaged lateral line(s) would have cost around $1,000 and taken about a day to perform, and that he would have made the repairs for free if he had been asked to do so. [Dkt. #54, Ex. 4, Nelson Dep., 96:22-97:22]. The Yearys contend neither Nelson nor the City have offered or agreed to make such repairs.

Nelson sent the Yearys a $660 invoice for the line installations, of which $200 was for electrical installation, $200 was for the gas installation, $200 was for the water line installation and $60 was for water line parts. [Dkt. #54, Ex. 3, Invoice]. The Yearys never paid Nelson's invoice. [*Id.,* Nelson Dep., 96:5-15].

On November 23, 2010, The Yearys filed a Notice of Tort Claim against the City for its alleged negligent work related to installation of the water meter. [Dkt. #1, Complaint, ¶19]. On February 16, 2011, the City notified them the claim had been denied. [*Id.,* ¶20].

The actual water meter and water line replacement completed by the Yearys cost a total of less than $1,500.00 for all water system repairs that have been performed. [Dkt. #54, Ex. 5, Sharon Yeary Dep., 82:2-83:1; 84:11-85:14].

The water line and water meter replacement took seven months. The parties dispute the

4

reasonableness of this delay.  Defendants assert the replacement line could have been completed within two days.  However, Michael Yeary testified there was a delay due to confusion over whether the City or county owned the easement along the road in front of his building, and it took seven months to obtain an exemption from the DEQ, and have the City install a new water line extension and meter.  [Dkt. #51, Ex. 1, M. Yeary Dep., 29:24-31:20; Dkt. #60, Ex. 1; Ex. 2, Jackie Wayne Bower Dep., 15:8-16:23; 43:13-44:1; 49:20-50:20; Ex. 12, Application for Municipal or Rural Water Extension].  The City did not submit an application with the DEQ to the Yearys to get an exemption until March 2010.  [Dkt. #60, Ex. 12, Application].  The water line and meter were installed in May 2010.  [Dkt. #54, Ex. 5, S. Yeary Dep., 51:18-21].[1]

       The Yearys assert a claim for lost profits based on the delay in replacing the water line and meter.  At the time Nelson installed the first water line, the Yearys were in the process of constructing a building to house their anticipated new business. Sharon Yeary testified plaintiffs did not establish a business at the time the water line and meter were replaced or through the remainder of 2010 because "[w]e had things to do to finish the building" to get it ready to open a business. [Dkt. #54, Ex. 5, S. Yeary Dep., 51:18-52:10].  In 2011, the Yearys were still working on the building, and the tornado in Joplin also contributed to the delay in opening the Grove business.  [*Id.,* 52:11-18].  As of Sharon Yeary's deposition on August 2, 2012, the Yearys had brought a couple of trailers down to get ready to start selling them. [*Id.,* 52:23-53:2].  She characterized this as a "soft opening" as opposed to a "hard opened business." [*Id.* 53:3-3-6]. She testified they planned to bring a few trailers down and sell when they were in Grove for weekends and evenings and would not have a storefront in Grove. [*Id.,* 53:6-11].  At the time of her deposition, plaintiffs had not conducted any sales or obtained sales tax permits for Delaware

---

[1] Despite Sharon Yeary's testimony, plaintiffs claim, and their expert, in preparing his opinion, assumed a seven-month delay, until July 2010, in the replacement of the water line and meter.

5

County. [*Id.,* 53:12-17]. At the time of Michael Yeary's deposition on October 26, 2012, the building had not yet been completed, nor had plaintiffs opened the Grove location for business. [Dkt. #51, Ex. 1, M. Yeary Dep., 49:17-21].

Plaintiffs' expert, Patrick W. Fitzgerald, opines that as a result of the delay in obtaining water service, plaintiffs incurred lost net income for 2011 of $27,381, and has incurred future lost net income of $300,627, for a total of $327,648. [Dkt. #60, Ex. 9].[2]

## II. Summary Judgment Standard

Summary judgment is appropriate if the pleadings, affidavits and depositions "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1402 (10th Cir. 1997).

A party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact, but must support such assertions by citing to particular parts of the record, including depositions, documents, affidavits or other materials. Fed.R.Civ.P. 56(c)(1). Mere conclusory allegations, without evidentiary support, do not create a genuine issue of fact. *L & M Enters., Inc. v. BEI Sensors & Sys. Co.,* 231 F.3d 1284, 1287 (10th Cir. 2000). [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

---

[2] Defendants filed a *Daubert* motion with respect to Fitzgerald's opinion. [Dkt. #53].

### III. Analysis

### A. Lost Profits Claim

Both the City and Nelson seek summary judgment on the Yearys' claim for lost profits. Oklahoma law allows for recovery of anticipated lost profits if the loss is "capable of *reasonably accurate measurement or estimate.*" *Specialty Beverages, LLC v. Pabst Brewing Co.,* 537 F.3d 1165, 1178 (10th Cir. 2008) (emphasis in original) (citing *Digital Design Group, Inc. v. Info. Builders, Inc.,* 24 P.3d 834, 844 (Okla. 2001); *Florafax Int'l, Inc. v. GTE Mkt. Res., Inc.,* 933 P.2d 282, 292 (Okla. 1997) and 23 O.S. § 21)). This is true regardless of whether the business is new or well established. *Specialty Beverages,* 537 F.3d at 1178. However, to recover damages for lost profits, plaintiffs must demonstrate "the fact of damage . . . with reasonable certainty," and the "amount of damages may not be based upon mere speculation and conjecture." *Weyerhaeuser Co. v. Brantley,* 510 F.3d 1256, 1267 (10th Cir. 2007) (quoting *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416, 425-26 (10th Cir. 1952)).

In order to establish a lost profits claim, a plaintiff must establish (1) that the loss was contemplated by the parties; (2) that the loss flows directly from the breach or incident; and (3) that the damages claims are a reasonably accurate measurement of the loss. *Specialty Beverages,* 537 F.3d at 1179; *Florafax,* 933 P.2d at 292.

The Yearys' lost profit claim fails because they have presented insufficient evidence of the second and third elements—that the loss flows directly from the delay in obtaining water service and that the damages claims are a reasonably accurate measurement of the loss. The seven-month delay occasioned by the water line issue ended in May 2010. As of October 26, 2012, the building was still not complete and the Grove location had not yet opened. It is not possible for the Yearys to establish their alleged loss flows directly from the complained-of

incident because they cannot establish when they would have opened for business had the incident not occurred, as evidenced by their continuing inability to get the business opened to date. Absent evidence that the new business has ever launched, no reasonable juror could conclude defendants' conduct caused them to lose *any* profits at the Grove location, much less that plaintiffs established the damages are a reasonably accurate measurement of the loss.[3]

Defendants are entitled to summary judgment with respect to plaintiffs' claim of lost profits.

### B. Lack of Subject Matter Jurisdiction

In their Complaint, plaintiffs alleged the amount in controversy exceeded $75,000 and asserted this court had diversity jurisdiction pursuant to 28 U.S.C. § 1332. Where the court is satisfied to a legal certainty, after examination of the proofs, that plaintiffs were never entitled to recover the requisite amount in controversy, the suit will be dismissed. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289 (1938); *City of Boulder v. Snyder,* 396 F.2d 853, 856 (10th Cir. 1968); *Sanders v. Hiser,* 479 F.2d 71, 74 (8th Cir. 1973). "While the general rule counsels against deciding the issue when the merits of the case and the amount in controversy are intertwined, there are "flagrant" cases which justify an exception." *Sanders,* 479 F.2d at 74 (citing C. Wright, Law of Federal Courts § 33 at 113 (1971)).

The court concludes this is precisely such a case. Based on the uncontroverted facts and applicable law, plaintiffs never had viable claim for lost profits against defendants. Absent that claim, the amount in controversy did not exceed $1,500. Therefore, the court is

---

[3] Because plaintiffs have failed to present evidence sufficient to establish the second element—that the delay in obtaining water service resulted in *any* lost profits—the court finds it unnecessary to address defendants' *Daubert* motion challenging the reliability of the expert's opinion.

satisfied to a legal certainty the plaintiffs were never entitled to recover the requisite amount in controversy to confer diversity jurisdiction. This suit must be dismissed.

## IV. Conclusion

For the foregoing reasons, defendants' Motions for Summary Judgment [Dkt. ##51, 54] are granted in part. The court's disposition of plaintiffs' lost profits claim deprives the court of subject matter jurisdiction of the remaining claims in the case. Therefore, the case is dismissed.

ENTERED this 10th day of January, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT